## AFFIDAVIT IN SUPPORT OF A
## SEARCH WARRANT APPLICATION

I, David C. Fife, being first duly sworn, hereby state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises located at 104 Summit Terrace, Apt. 42, South Portland, Maine 04106, hereinafter "PREMISES," further described in Attachment A, for the things described in Attachment B. This application seeks authority for a warrant to search for and seize evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 2252A(a)(1), (a)(2), and (a)(5)(B), which relate to the knowing transportation, receipt, distribution and possession of child pornography.

2.      I am a Special Agent (SA) with Homeland Security Investigations (HSI) and have been since August 2009. I am currently assigned to HSI's Portland, Maine office. I have participated in numerous criminal investigations, to include matters involving the sexual exploitation of children. In my career I have utilized various investigative tools and techniques to include the use of search warrants.

3.      This affidavit is intended to provide the facts necessary for a determination of probable cause for the requested search warrant. The facts set forth in this affidavit are based on my personal knowledge, information obtained during my participation in this investigation, information from others, including law enforcement officers, my review of documents and computer records related to this investigation, and information gained through my training and experience.

## BACKGROUND OF INVESTIGATION

### Peer-to-peer file sharing

4.  Peer-to-peer (P2P) file sharing is a popular method of communication available to internet users through the use of special software. Computers linked together through the internet using this software form a network that allows for the sharing of digital files between users on the network. A user first obtains the P2P client software, which can be downloaded from the internet. In general, P2P client software allows the user to set up files on a computer to be shared with others running compatible P2P client software over a specific network. A user obtains files by opening the P2P client software on the user's computer and conducting a search for files currently being shared on the network.

5.  Files being shared by P2P clients are processed by the client software that connects a user to the file-sharing network. As part of this processing, a hashed algorithm value is computed for each file being shared, which uniquely identifies it on the network. A file processed by this hash algorithm operation results in the creation of an associated hash value often referred to as a digital signature. Some hash algorithms provide a certainty exceeding 99.99 percent that two or more files with the same hash value are identical copies of the same file regardless of their file names. By using a hash algorithm to uniquely identify files on a P2P network, network efficiency is improved. Because of this, typically, users may receive a selected file from numerous sources by accepting segments of the same file from multiple clients and then reassembling the complete file on the local computer. This is referred to as a multiple-source download. The client software succeeds in reassembling the file from different sources only if all

the segments came from exact copies of the same file. P2P file-sharing networks use hash values to ensure exact copies of the same file are used during this process.

### The SHA-1 hash algorithm

6. There are several commonly used hash algorithms, including SHA-1, SHA-256 and MD5. SHA stands for Secure Hash Algorithm. I know from my training and experience in prior investigations that hash values, or unique alphanumeric strings generated using mathematical algorithms, are sometimes called "digital fingerprints" for electronic files. A hash algorithm computes a condensed representation of a message or a data file. For example, the SHA-1 hash value of the phrase "United States District Court" is the following:

**ae11dcbf2f4e4273b9e9b8121f968620adac6a3f**

This string is known as a "message digest" or fingerprint. An alphanumeric string of the same length would be generated by hashing other types of files, including digital images or video files.

7. Hashing was originally created to verify the integrity of network traffic and file transfer data. Hashing was later adopted for civilian uses. Hashing is used for various tasks to include verifying file integrity when downloading a piece of software. For instance, when you download or receive a file, you can use hashing to guarantee that you have the correct, unaltered file by comparing its hash with the original. You are essentially verifying the file's integrity.

8. The SHA-1 hash is one of seven approved hash algorithms deemed secure by the National Institute of Standards and Technology because it is computationally infeasible for two files with different content to have the same SHA-1 hash value. Any

3

change to a file will, with a very high probability, result in a different hash value. For example, as noted above, the hash value of the phrase "United States District Court" is:

**ae11dcbf2f4e4273b9e9b8121f968620adac6a3f**

By contrast, the hash value of the phrase "United States District Courp," which differs by only one letter, is completely different:

**fe7f0364257a2c759c4369a586f23bae3878842d**

In the same way, changing one pixel of a digital image would result in a completely different hash value than the hash for the unaltered image.

9. Although federal agencies have been instructed to stop using SHA-1 for certain functions in favor of other hash algorithms, it remains an approved algorithm for performing such functions as hashing passwords and verifying that no changes have been made to a file.

**The BitTorrent network**

10. The BitTorrent network is a very popular and publicly available peer-to-peer file-sharing network. Most computers that are part of this network are referred to as "peers." The terms "peers" and "clients" can be used interchangeably when referring to the BitTorrent network. A peer can simultaneously provide files to some peers while downloading files from other peers. The BitTorrent network can be accessed by computers running many different client programs, some of which include the BitTorrent client program, uTorrent program, and Vuze program. These client programs are publicly available, free P2P programs that can be downloaded from the Internet. BitTorrent client programs share common protocols for network access and file sharing, though the user interface, features, and configuration may vary between clients and versions of the same client.

11. During the installation of typical BitTorrent network client programs, various settings are established that configure the host computer to share files. Depending upon the BitTorrent client used, a user may have the ability to reconfigure some of those settings during installation or after the installation has been completed. Typically, a setting establishes the location of one or more directories or folders whose contents (files) are made available to other BitTorrent network users to download.

12. In order to share a file or a set of files on the BitTorrent network, a "torrent" file needs to be created by the user that initially shares the file or set of files. A torrent is typically a small file that describes the file(s) that are being shared, and may include information on how to locate the file(s) on the BitTorrent network. A typical BitTorrent client will have the ability to create a torrent file. It is important to note that the torrent file does not contain the actual file(s) being shared, but information about the file(s) described in the torrent, such as the name(s) of the file(s) being referenced in the torrent and the "info hash" of the torrent. The info hash is a SHA-1 hash value of the set of data describing the file(s) referenced in the torrent, which includes the SHA-1 hash value of each file piece, the file size, and the file name(s).

13. The info hash of each torrent uniquely identifies the torrent file on the BitTorrent network. The torrent file may also contain information on how to locate file(s) referenced in the torrent by identifying trackers. Trackers are computers on the BitTorrent network that collate information about the peers/clients that have recently reported they are sharing the file(s) referenced in the torrent file. A tracker is only a pointer to peers/clients on the network who may be sharing part or all of the file(s) referenced in the torrent. It is important to note that the trackers do not actually have

the file(s) and are used to facilitate locating other peers/clients that have the entire file(s) or at least a portion of the file(s) available for sharing.

14. Once a torrent is created, in order to share the file(s) referenced in the torrent file, a user typically makes the torrent available to other users, in some cases via websites on the internet. In order to locate torrent files of interest, a typical user will use keyword searches within the BitTorrent network client itself or on websites hosting torrents. Once a torrent file is located that meets the keyword search criteria, the user will download the torrent file to their computer. The BitTorrent network client will then process that torrent file in order to find trackers or utilize other means that will help facilitate finding other peers/clients on the network that actually have all or part of the file(s) referenced in the torrent file. It is again important to note that the actual file(s) referenced in the torrent are obtained directly from other peers/clients on the BitTorrent network and not the trackers themselves. Typically, the trackers on the network return information about remote peers/clients that have recently reported that they have the same file(s) available for sharing (based on SHA-1 info hash value comparison), or parts of the same file(s), to include the remote peer/client's Internet Protocol (IP) addresses.[1]

---

[1] An IP address is generally expressed as four numbers separated by decimal points, and is unique to a particular computer during an online session. The IP address provides a unique location, making it possible for data to be transferred between computers. A computer running P2P client software, in this case BitTorrent, has an IP address assigned to it while it is on the internet. Investigators can search public records, including the public database of the American Registry of Internet Numbers (ARIN), located at http://www.arin.net, to determine the internet service provider who has assigned that IP address. Based upon the IP address assigned to the computer sharing the files, subscriber information can be obtained from the internet service provider via legal process.

15. By way of example, a person interested in obtaining child pornographic images on the BitTorrent network could open a BitTorrent client application on his/her computer and conduct a keyword search for files using a term such as "preteen sex." The results of the torrent search are typically returned to the user's computer and displayed on the torrent hosting website. The hosting website will typically display information about the torrent, which can include the name of the torrent file, the name of the file(s) referenced in the torrent file, the file size, and the info hash SHA-1 value of the torrent file. The user can then select a torrent of interest to download to his/her computer, and the torrent file would be processed by the user's BitTorrent client program. The user then selects from the displayed results the file(s) they want to download as referenced in the torrent file. Using trackers and other BitTorrent network protocols (such as Distributed Hash Tables, Peer Exchange, and Local Peer Discovery), peers/clients are located that have recently reported they have the file(s) or parts thereof referenced in the torrent file available for sharing. The file(s) are then downloaded directly from the computer(s) sharing the file. Typically, once the BitTorrent network client has downloaded part of a file, it may immediately begin sharing the file with other users on the network. The BitTorrent client program succeeds in reassembling the file(s) from different sources only if it receives "pieces" with the exact SHA-1 piece hash described in the overall torrent file. During the download process, a typical BitTorrent client program displays the IP address of the peers/clients that appear to be sharing part or all of the file(s) referenced in the torrent file or other methods utilized by the BitTorrent network protocols. The downloaded file is then stored in the area previously designated by the user and/or the client program. The downloaded file(s), including the torrent file, will remain in this location until they are moved or deleted.

16. Law enforcement has created BitTorrent network client programs that obtain information from trackers about peers/clients recently reporting that they are involved in sharing digital files of known child pornography (based on the SHA-1 hash value). These modified programs then allow an investigator to query or download a file from a single IP address, as opposed to obtaining the file from multiple peers/clients on the network. This procedure enables the detection and investigation of computers and specific IP addresses involved in sharing digital files of known actual child pornography on the BitTorrent network. Once a client user is identified by law enforcement as recently having a file or files believed to be child pornography, in whole or in part, an investigator can then query that client user directly to confirm the client user has that file, in whole or in part, and s/he can download that file directly and exclusively from the client user. During the query and/or downloading process from a remote BitTorrent network client, certain information may be exchanged between the investigator's client and the remote client they are querying and/or downloading a file from. This information, which is known to all BitTorrent clients but not generally displayed, includes 1) the remote client's IP address; 2) a confirmation from the remote client that they have and are sharing pieces of the file(s) being requested, in whole or in part; and 3) the remote client's program and version.

**SPECIFIC PROBABLE CAUSE**

17. On March 10, 2023, beginning at approximately 1:38 a.m. EST and continuing through the following day, a South Portland Police Department detective was using the BitTorrent file-sharing program while conducting undercover investigations into the sharing of child pornography over the internet. The detective is a member of the Maine State Police Computer Crimes Task Force and a part-time task force officer of

HSI. During this time period, a computer sharing child pornography was located on the BitTorrent file-sharing network. The detective completed a download of the following file that a computer at IP address 198.255.186.6, which was determined to be using Frostwire[2] version 2.6.3/libtorrent 1.2.17.0, had made available:

> **File Name**: GOOD LITTLE BOYS P101 (pthc, gay, pedo) Mikael & his friend sucks Mikaels Daddy (2cums!!!).mpg

This file was downloaded only from the computer at IP address 198.255.186.6.

18. Following this, the detective contacted me and provided me with a copy of the video file he had downloaded from the computer at IP address 198.255.186.6. I reviewed the video, which I found to be approximately 5 minutes 24 seconds long, and depicted two naked young boys, both aged between approximately 8 and 10 years old, alternately performing oral sex on an adult male. A still image from this video is marked as Exhibit 1 and submitted herewith under seal.

19. Following this download, the I conducted a Domain Name Server (DNS) check on IP address 198.255.186.6 through the American Registry of Internet Numbers, whose records reflected that IP address 198.255.186.6 is registered to Charter Communications.

20. On/around March 10, 2023, I submitted a DHS summons to Charter Communications for subscriber information regarding IP address 198.255.186.6 specific to the dates and times of the download activity discussed above. Charter

---

[2] Based on open-source research I have conducted, libtorrent appears to be an add-on torrent interface for Frostwire, which is itself a free BitTorrent client used to transfer files via the BitTorrent protocol.

Communications' response to the summons on March 15, 2023, revealed that the IP address was assigned to a Christina Engstrom, born in 1997, at the PREMISES.

21. Based on public records and other information, it appears that the PREMISES is primarily occupied by Ms. Engstrom, who also uses the name Tina Marie Engstrom, and her roommate Lois Turner, born in 1995. Research on social media revealed that Ms. Turner appears to be very close friends and/or in a romantic relationship with another South Portland man named Sheldon Troy Rembert, born in November of 1992. Rembert is a registered sex offender in Maine (10-year registrant) for a 2020 state conviction of possession of sexually explicit material involving a minor under the age of 12.

## COMPUTERS, ELECTRONIC STORAGE AND FORENSIC ANALYSIS

22. As described above and in Attachment B, this application seeks permission to search and seize records that might be found on the PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

23. *Probable cause.* I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.

Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

   b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating systems or application operations, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

   d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

  24. *Characteristics of child pornography offenders.* As set forth above, probable cause exists to believe that an individual at the PREMISES has distributed, transported, received, or possessed child pornography. Based upon my knowledge and experience in child pornography investigations, and the training and experience of other

law enforcement officers with whom I have had discussions, I know that there are certain characteristics common to individuals involved in such crimes:

  a. Those who distribute, transport, receive, or possess child pornography, or who attempt to commit these crimes may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Such individuals oftentimes use these materials for their own sexual arousal and gratification.

  b. Those who distribute, transport, receive, or possess child pornography, or who attempt to commit these crimes often possess and maintain copies of child pornography material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. These individuals typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

  c. Those who distribute, transport, receive, or possess child pornography, or who attempt to commit these crimes often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. They often maintain these collections for several years and keep them close by, usually at the individual's residence, to enable the collector to view the collection, which is valued highly.

  d. Those who distribute, transport, receive, or possess child pornography, or who attempt to commit these crimes also may correspond with and/or meet others to share information and materials; they rarely destroy correspondence from other child pornography distributors/collectors; they conceal such correspondence

as they do their sexually explicit material; and they often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

      25.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any computer in the PREMISES because:

      a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

      b.    As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the

United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.

        c.     Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection

logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

      d.    A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

      e.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      f.    Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or

absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

26. *Outbuildings and motor vehicles*. Based on my training and experience I know that much of the media referenced above, which may contain contraband, fruits and evidence of crime, is by its very nature portable, this includes as example but is not limited to extremely compact storage devices such as thumb drives, laptop computers, and smart phones. In my training and experience, I know it is not uncommon for individuals to keep such media in multiple locations within their premises, including in outbuildings and motor vehicles.

27. *Necessity of seizing or copying entire computers or storage media*. In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

   a. **The time required for an examination**. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic

electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

      b.    **Technical requirements**. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the PREMISES. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

      c.    **Variety of forms of electronic media**. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

    28.    *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

29. Because it appears that multiple people share the PREMISES as a residence, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## CONCLUSION

I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and seize the items described in Attachment B.

Dated this 7th day of April, 2023.

DAVID C FIFE
Digitally signed by DAVID C FIFE
Date: 2023.04.07 06:01:18 -04'00'

David C. Fife, Special Agent
Homeland Security Investigations

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedures

Date: Apr 07 2023

City and state: Portland, Maine

Judge's signature

Karen Frink Wolf, U.S. Magistrate Judge
Printed name and title

18